36691/01245/MHW/REN

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

DAVID GEVAS,

              Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC., et al.,

              Defendants.

No. 2012 CV 1297

Hon. John Z. Lee, District Judge

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, WEXFORD HEALTH SOURCES, INC., TIFFANY UTKE, L.P.N., IMHOTEP CARTER, M.D., HEIDI MOSS, R.N., PARTHASARATHI GHOSH, M.D., LATANYA WILLIAMS, P.A., RONALD SCHAEFER, M.D., and ARTHUR FUNK, M.D. (the "Wexford Defendants"), by and through their attorneys, Matthew H. Weller and Ronald E. Neroda of CASSIDAY SCHADE LLP, and for their Statement of Material Facts in Support of Motion for Summary Judgment, hereby state as follows:

## I.      Background & Plaintiff's Claims

1.     This case involves the Plaintiff's claims that he did not receive certain prescribed medications and optical products on a timely basis at Stateville Correctional Center. (See Plaintiff's Complaint, Doc. #63[1]). The Plaintiff has been an inmate of the Illinois Department of Corrections since 1996 following two murder convictions. (See https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx). The Plaintiff is well known

---

[1] Following appointment of counsel, Plaintiff filed an Amended Complaint (Doc. #227) subsequent to filing his original Complaint (Doc. #63). Other than adding a new party, Director of the IDOC, S.A. Godinez, the Amended Complaint merely incorporates by reference the allegations in the original Complaint, so Defendants' memoranda herein will refer to the court –filed original Complaint (Doc. #63).

as a litigious inmate having filed numerous prior lawsuits and having multiple claims pending in this very Court.

2.     The instant case sets forth claims from 2010 – 2012, alleging that during that time the various Defendants acted with deliberate indifference to his serious medical needs. More specifically, the Plaintiff has set forth three claims in his Complaint: first, as against Tiffany Utke, L.P.N. ("Nurse Utke") and Norman Patterson, O.D. ("Dr. Patterson"), he claims that he did not timely receive properly fitting contact lenses, eye glasses, or contact rewetting drops (see Doc. #63, pp. 5 - 8); second, as against Parthasarathi Ghosh, M.D. ("Dr. Ghosh"), Ronald Schaefer, M.D. ("Dr. Schaefer"), LaTanya Williams, P.A., ("Ms. Williams"), Imhotep Carter, M.D. ("Dr. Carter"), Arthur Funk, M.D. ("Dr. Funk"), Wexford Health Sources, Inc. ("Wexford"), and co-Defendant, A. Matuzas, he claims that his prescription for Tramadol medication was permitted to expire prior to him receiving a renewed prescription order (see Doc. #63, pp. 8 – 11); and lastly, as against Wexford, Dr. Carter, Heidi Moss, R.N. ("Nurse Moss"), Dr. Ghosh, Ms. Williams, Dr. Schaefer, Dr. Funk, and co-Defendants, Royce Brown-Reed, Ester Martin, Darryl Edwards, Marcus Hardy, Charles Fasano, A. Matuzas, Regina Beattie, and Boswell Pharmacy Services ("Boswell"), the Plaintiff claims that he did not receive certain medications at Stateville because the medications had run out of stock (see Doc. #63, p. 12 - 14).

## II.     Medical Administration Records (MAR) and Medical Records

### A.     Documents Produced

3.     The Plaintiff's Medical Administration Records ("MAR") relative to the time period of the Plaintiff's claims have been produced by the IDOC. (See **Exhibit "A"** attached hereto). The MAR forms record the day-by-day distribution of medications to inmates at Stateville. (See **Ex. "F,"** pp. 31 – 33, 36, 37). The Plaintiff's medical records, containing his

providers' progress notes and prescription orders for the relevant time period, have also been produced. (See **Exhibit "B"** attached hereto).

### III.     Testimony of Plaintiff

**A.     Background**

4.      The Plaintiff (d/o/b: 6/29/1965) has been an inmate of the Illinois Department of Corrections (hereinafter referred to as "IDOC") since 1993, following his guilty plea to a double murder charge. He has been housed at various IDOC facilities throughout the course of his incarceration, but his claims in this case arise from his current incarceration at Stateville Correctional Center (hereinafter referred to as "Stateville"), where he has been housed since 2010. (See Plaintiff's deposition transcript attached hereto as **Exhibit "C,"** pp. 7 - 9).

5.      The Plaintiff has filed a number of lawsuits since his admission to custody of the IDOC. Based on Plaintiff's answers to written discovery, he had filed six lawsuits before filing the instant case. Since this lawsuit, the Plaintiff has filed an additional three lawsuits. (See **Ex. "C,"** pp. 13 - 33; see also Plaintiff's answers to interrogatories and amended answers to interrogatories attached as exhibits #1 and #2, to Plaintiff's deposition transcript; and PACER search results attached hereto as **Exhibit "D"**).

**B.     Contact Lenses**

6.      The Plaintiff has prescription bifocal glasses, which were provided to him at Stateville. (See **Ex. "C,"** p. 49).

7.      The Plaintiff was first prescribed contact lenses as an inmate while at Lawrence Correctional Center in 2010. (See **Ex. "C,"** p. 40). He received contacts at Lawrence Correctional Center on April 28, 2010. (See **Ex. "C,"** p. 124).

8.      The contact lenses that the Plaintiff signed for at Lawrence Correctional Center (his home institution prior to Stateville) in April, 2010, were the second or third pair that he had received. (See **Ex. "C,"** pp. 132, 134).

9.      Around the time that he came to Stateville in May 2010, the Plaintiff noticed irritation from his contact lenses. (See **Ex. "C,"** p. 41).

10.     The Plaintiff believes that contact lenses, and not eye glasses, are needed to correct his vision. (See **Ex. "C,"** p. 63). The Plaintiff did not have contact lenses or glasses prior to his admission to custody of the IDOC. (See **Ex. "C,"** p. 64).

11.     In May, 2010, the Plaintiff requested an appointment in the eye clinic because his right contact lens was causing him irritation. (See **Ex. "C,"** p. 45). The Plaintiff was provided with an appointment and he saw former co-Defendant, Dr. Patterson[2] (a non-Wexford employee), the Stateville optometrist. According to the Plaintiff, Dr. Patterson determined that the Plaintiff's contact lens was not fitting properly, however, Dr. Patterson took no corrective action, and refused to submit the Plaintiff for a new right contact lens. (See **Ex. "C,"** p. 47).

12.     The Plaintiff first saw Dr. Patterson, relative to his current incarceration at Stateville, on or about June 29, 2010. (See **Ex. "C,"** p. 135). At that time, the Plaintiff reported eye irritation and pain to the doctor and, according to the Plaintiff, the doctor said this was from the lens not fitting properly. (See **Ex. "C,"** p. 136, 137). The Plaintiff claims that Dr. Patterson refused to give him a new contact lens and would not give him a reason why not. (See **Ex. "C,"** p. 138). The Plaintiff admitted that had Dr. Patterson done so, Wexford would have then had a collegial review for approval of the lenses. (See **Ex. "C,"** p. 141).

---

[2] Dr. Patterson was an independent contractor at Stateville, and a co-Defendant in this case before he reached a settlement with the Plaintiff.

13.      At the Plaintiff's next visit on August 17, 2010, Dr. Patterson again refused to write a "consultation" for the Plaintiff's right contact lens. (See **Ex. "C,"** p. 145). The Plaintiff claims that he wrote a grievance after that appointment but did not receive it back. He claims that Stateville has "an absolute habit of losing…grievances mysteriously, intentionally…" (See **Ex. "C,"** p. 146).

14.      The Plaintiff admitted that he received contact lens solution from Tiffany Utke, R.N. (See **Ex. "C,"** p. 147).

15.      The Plaintiff claims that he did not notice that the contact lens had any problem at the end of April, 2010, while he was still at Lawrence. (See **Ex. "C,"** p. 147).

16.      Dr. Patterson wrote a consultation on January 5, 2011, when he saw the Plaintiff. (See **Ex. "C,"** p. 149). Before that time, the Plaintiff claims that he heard "every excuse under the sun," as to why he had not received his lenses. (See **Ex. "C,"** p. 149).

17.      The Plaintiff filed a grievance claiming that he did not receive his new right contact lenses from May, 2010, to January 5, 2011, The Plaintiff admitted that Dr. Ghosh does not have the authority to approve or not approve contact lenses. (See **Ex. "C,"** p. 151).

18.      January 5, 2011, was the first time that Dr. Patterson wrote the Plaintiff a prescription for replacement contact lenses after the Plaintiff's complaint of irritation with his right contact lens. (See **Ex. "C,"** pp. 160 - 161). Prior to that, Dr. Patterson gave the Plaintiff a hard contact lens, which was wrong according to the Plaintiff. (See **Ex. "C,"** p. 161 – 162). The Plaintiff testified that once he received the soft contact lenses, those lenses would then break after two to four uses, every time. (See **Ex. "C,"** p. 162).

19.      The first contact lens that the Plaintiff received from Dr. Patterson was a hard lens around February 9, 2011. (See **Ex. "C,"** pp. 47 – 48).

20.     The Plaintiff claims that Dr. Patterson, or another eye clinic employee, fabricated a document relative to the Plaintiff receiving contact lenses. (See **Ex. "C,"** pp. 131 – 132).

21.     The Plaintiff's testified that Dr. Patterson intentionally did not write the consultation for his contact lenses. (See **Ex. "C,"** p. 154). He also claims that he was told "lies and fabrications," by Dr. Patterson and Nurse Utke, and "every excuse under the sun," as to why he did not receive his right contact lens, "which turned out to be false." (See **Ex. "C,"** pp. 155 – 156, 157). He claims that he confirmed these lies and fabrications with Dr. Ghosh. (See **Ex. "C,"** p. 157).

22.     Dr. Patterson then ordered the Plaintiff his current lenses, which are 30-day disposable, Proclear brand, and are "completely off," according to the Plaintiff. (See **Ex. "C,"** pp. 162 - 163). According to the Plaintiff, these lenses were a second prescription because his eyes were changing so rapidly. (See **Ex. "C,"** p. 163 – 164; see also <u>Doc. #236-3</u>, p. 4 of 13). The Plaintiff testified that right before that time, Dr. Patterson was very angry with him regarding a prior lawsuit filed by the Plaintiff against the doctor, *Gevas v. McCann*. (See **Ex. "C,"** pp. 164 - 166). According to the Plaintiff, Dr. Patterson ordered him the wrong contact lenses out of anger. (See **Ex. "C,"** pp. 166 – 167).

23.     The Plaintiff testified that Tiffany Utke was not always present when he had appointments with Dr. Patterson. (See **Ex. "C,"** p. 210). When she was present, the Plaintiff's interactions with Nurse Utke would be limited to her handing the Plaintiff his contacts and having him sign the form of receipt. Plaintiff would also complain to her on occasion when she would hand out medications in the cell house. (See **Ex. "C,"** p. 211).

24.     Plaintiff claims that he has had problems with his Proclear contact lenses breaking after two to four uses. (See **Ex. "C,"** p. 64). The Plaintiff confirmed that, upon receipt of his

contact lenses, he would sign an IDOC form agreeing to be responsible for the lenses. (See **Ex. "C,"** p. 65). Each time, he would receive contact lenses along with a storage case and solution. (See **Ex. "C,"** p. 65).

## C.     Medications

25.     The Plaintiff is aware of the practice for inmates at Stateville to request medical appointments: inmates can submit a written request through an in-house mail system; or, they can make a verbal request from a medical technician. (See **Ex. "C,"** p. 43, 44).

26.     Royce Brown-Reed is the IDOC healthcare unit administrator. (See **Ex. "C,"** pp. 174 – 175). The Plaintiff would complain to her regarding his Tramadol and concerning his medical care. (See **Ex. "C," p**p. 175 - 176). According to the Plaintiff, Ms. Brown-Reed failed to act upon his complaints and retaliated against him by writing a note in Plaintiff's medical record for Dr. Obaisi to take the Plaintiff off of Tramadol. (See **Ex. "C,"** p. 178).

27.     The Plaintiff also testified that he complained to IDOC employee, Ester Martin, about not receiving his medications and optical care products. He testified that Ms. Martin blew him off. (See **Ex. "C,"** pp. 181 - 183).

28.     The Plaintiff testified that these IDOC employees are responsible for the healthcare at Stateville and for overseeing that Wexford abides by its contract. He asserts that Ester Martin is responsible for making sure that the Plaintiff gets his medication. (See **Ex. "C,"** pp. 183 - 184).

29.     The Plaintiff claims that his medical records have been fabricated and that "they," "covered…up" the dates of him not receiving his medication "as much as humanly possible." (See **Ex. "C,"** p. 190). The Plaintiff admitted, however, that he cannot say which dates in the MAR forms were fabricated. (See **Ex. "C,"** p. 191).

30.     The Plaintiff testified that the IDOC pharmacy technician, Regina Beattie, told him that co-Defendant, Boswell, was late on their medication delivery of Tramadol to Stateville and not always on time – she told the Plaintiff that it was Boswell's fault. (See **Ex. "C,"** p. 203).

31.     The Plaintiff's interactions with Dr. Carter involved the doctor evaluating the Plaintiff in the healthcare unit at Stateville. (See **Ex. "C,"** p. 213). The Plaintiff also saw Dr. Ghosh in the clinical setting at Stateville. (See **Ex. "C,"** p. 215).

32.     The Plaintiff testified that his interactions with Heidi Moss would be seeing her in the healthcare unit and discussing his medical issues with her. He could not recall whether Ms. Moss ever evaluated the Plaintiff, provided him with medications, wrote prescriptions, or was otherwise involved in his clinical care. (See **Ex. "C,"** pp. 213 - 214).

33.     The Plaintiff testified that he would see Ms. Williams in the healthcare unit and that she had prescribed him Tramadol. (See **Ex. "C,"** p. 217).

34.     The Plaintiff testified that Dr. Schaefer was a doctor at Stateville and that he was also a doctor at Lawrence Correctional Center when the Plaintiff was there. The Plaintiff testified that when he came to Stateville, he was on Indocin and Tramadol and that Dr. Schaefer took him off of Tramadol because the doctor said that Plaintiff could not be on both medications for his shoulder pain. (See **Ex. "C,"** pp. 217 – 218).

35.     The Plaintiff testified that he was seen by Dr. Funk, the Wexford regional medical director, on one occasion in the clinical setting. He said that Dr. Funk prescribed him Tramadol and examined his knees and shoulder. (See **Ex. "C,"** p. 219).

36.     The Plaintiff was first prescribed Tramadol in 2008 or 2009, while at Lawrence Correctional Center, prior to his transfer to Stateville. (See **Ex. "C,"** p. 66). He was prescribed

Tramadol for alleged left shoulder pain following an assault by another inmate at Galesburg Correctional Center. (See **Ex. "C,"** pp. 66 – 67).

37.     The Plaintiff testified that his Tramadol prescription has been allowed to expire 11 times. (See **Ex. "C,"** p. 71).

38.     According to the Plaintiff, co-Defendant, Royce Brown-Reed placed a Post-It note in the Plaintiff's medical file to Dr. Obaisi (the current Stateville medical director), in July, 2012, trying to reduce the Plaintiff's Tramadol prescription. (See **Ex. "C,"** p. 72). Thereafter, Dr. Obaisi told him that prior providers had prescribed the Plaintiff Tramadol inappropriately. (See **Ex. "C,"** p. 72).

39.     At the time of his deposition on January 22, 2014, the Plaintiff conceded that he had a current prescription for Tramadol. (See **Ex. "C,"** p. 73). The prescription (at the time of the Plaintiff's deposition in January, 2014) was 50 milligrams twice a day, which the Plaintiff believes is inadequate. (See **Ex. "C,"** p. 77). The last time that the Plaintiff did not have a current prescription for Tramadol was around July of 2012. (See **Ex. "C,"** p. 73).

40.     From July, 2012, through the present, the Plaintiff conceded that he has received other medications for his shoulder pain, including, Indocin, Mobic (meloxicam), and Ibuprofen. (See **Ex. "C,"** p. 75).

41.     At the time of his deposition, the Plaintiff was taking the following medications: Neurontin (gabapentin)(1200 milligrams); Benadryl (100 milligrams p.m. dose); Mobic (meloxicam); Tramadol (50 milligrams twice a day); Remeron (30 milligrams); and Depakote (2,000 milligrams p.m. dose) (See **Ex. "C,"** p. 81 – 82, 84, 86).

42.     The Plaintiff has leg pain for which he is prescribed Neurontin (gabapentin). (See **Ex. "C,"** p. 76).

43. The Plaintiff is 5'11" and weighs over 300 pounds. (See **Ex. "C,"** p. 76). He has regular mental health appointments at Stateville. (See **Ex. "C,"** p. 90).

44. The Plaintiff did not recall refusing to take his medication on May 16, 2011, as indicated by the medical records. (See **Ex. "C,"** pp. 93 – 94). He admitted, however, that he has refused to take his medications out of "frustration" and "torment." (See **Ex. "C,"** pp. 94, 95, 99 – 100, 101). He also refused to provide medical staff with the reason why he was refusing his medications. (See **Ex. "C,"** p. 102).

45. The Plaintiff claims that his medical records have been "fabricated." (See **Ex. "C,"** p. 95, 104). He testified that his records were "fabricated lots of times that [he] got his medication when [he] truly didn't." (See **Ex. "C,"** p. 96).

46. At his deposition, the Plaintiff admitted to "mistakes" in the affidavit, which he previously filed in support of his motion for a preliminary injunction. (See **Ex. "C,"** p. 108). To wit, he admitted that where he stated that he had not received proper lubricating eye drops, he had, in fact, received the drops. (See **Ex. "C,"** p. 108). Additionally, his prescription for Depakote was not in the a.m. and p.m., as he stated, but had been changed to p.m. only. (See **Ex. "C,"** pp. 109, 110 – 111).

### IV. Testimony of Independent Contractor, Norman Patterson, O.D.

47. Prior to retiring, Dr. Patterson had his own optometry practice for 52 years. (See deposition transcript of Norman Patterson attached hereto as **Exhibit "D,"** p. 6). Dr. Patterson worked as the optometrist in the eye clinic at Stateville for 5 or 6 years. (See **Ex. "D,"** p. 7, 8, 9). During that time, he was an independent contractor. (See **Ex. "D,"** p. 9).

48. Dr. Patterson would see patients with scheduled appointments and perform eye examinations and eye glass repair work. (See **Ex. "D,"** p. 11).

49.     Dr. Patterson remembers the Plaintiff as a "smart aleck" who thought "he r[a]n the place." (See **Ex. "D,"** p. 15). The Plaintiff constantly lost his contact lenses and complained about his contact lenses. He complained about "everything that went on." The issues were mostly with the Plaintiff and not the people working with him. In Dr. Patterson's view, the Plaintiff wanted to make things as difficult as he could while he is in prison. (See **Ex. "D,"** pp. 15 – 16).

50.     The Plaintiff seemed to think that he was not seeing properly, however, he was seeing well with his contact lenses. The Plaintiff complained that he always lost his contact lenses, but there should have been no reason for him to lose them because they fit well in his eye. Dr. Patterson did not know why the Plaintiff was wearing contacts, because he was able to see as well with his glasses as he was with contacts. (See **Ex. "D,"** pp. 16, 22).

51.     Dr. Patterson saw the Plaintiff many times in the eye clinic. (See **Ex. "D,"** p. 17). Every time the Plaintiff would come in to the eye clinic for an appointment, he would have lost his contacts again. (See **Ex. "D,"** pp. 16 – 17).

52.     Inmates would receive a storage case with their contact lenses. (See **Ex. "D,"** p. 17).

53.     To receive an appointment in the eye clinic, the Plaintiff would place a request to be seen again and he would then be put in to see Dr. Patterson. (See **Ex. "D,"** p. 17).

54.     The Plaintiff was seen many more times than other patients. The standard with the Plaintiff was that he was unhappy with everything and complained that he could not see, among other things. Upon examination by Dr. Patterson, however, the Plaintiff was able to see. (See **Ex. "D,"** pp. 17 – 18).

55.     The Plaintiff had both contacts and eye glasses. The eye clinic at Stateville does not have equipment to fit the length of contacts. In Dr. Patterson's opinion, the IDOC should not

have allowed the Plaintiff to have contacts to begin with because his glasses allowed him to see. (See **Ex. "D,"** p. 18). The State was in charge of supplying the equipment in the eye clinic. (See **Ex. "D,"** p. 49).

56.     Dr. Patterson did not have any concerns at all about the Plaintiff being able to see wearing glasses, but the Plaintiff liked to wear contacts. It was the Plaintiff's own clumsiness that caused him to tear his contacts and also lose his lenses and have problems with them. (See **Ex. "D,"** pp. 19, 37). There was no reason why the Plaintiff should wear contacts rather than glasses. (See **Ex. "D,"** p. 38). If the Plaintiff had come to Dr. Patterson, first off, without contact lenses, the doctor would not have prescribed contacts for the Plaintiff. (See **Ex. "D,"** p. 42).

57.     The Plaintiff was never started on a new contact lens at Stateville. The eye clinic did not have the equipment to start new lens prescriptions, so the Plaintiff's existing lenses were simply reordered. Contact lenses are not kept in stock on site at Stateville. (See **Ex. "D,"** p. 19).

58.     When an inmate's new set of glasses would arrive at Stateville, the inmate would be given an appointment at the eye clinic to receive his glasses. (See **Ex. "D,"** p. 20).

59.     The other inmates in the eye clinic were happy to be taken care of and did not cause any problems at all. (See **Ex. "D,"** p. 21).

60.     Dr. Ghosh never saw patients in the eye clinic and Dr. Patterson did not have to consult with Dr. Ghosh on the patients in the eye clinic. (See **Ex. "D,"** pp. 24 - 25).

61.     Dr. Patterson did not recall any other inmates at Stateville with contact lenses, other than the Plaintiff, during the doctor's time at the facility. (See **Ex. "D,"** pp. 26, 29).

62.     In Dr. Patterson's opinion, the Plaintiff was treated well in the eye clinic. Despite the fact that the Plaintiff was known to be a "complainer," the staff did everything that they could to try to please the Plaintiff. (See **Ex. "D,"** p. 27).

12

63.     There was no instance where the Plaintiff ultimately did not receive his contact lenses. There is a process for approval, ordering, and making of contact lenses, which takes time to complete; in the meantime, the Plaintiff still had his eye glasses to wear. (See **Ex. "D,"** pp. 49 – 50).

## V.     <u>Testimony of IDOC Witnesses</u>

**A.     Wendy Olsen-Foxon**

64.     Ms. Olsen-Foxon is a "correctional med tech (C.M.T.)," at Stateville. She is employed by IDOC. (See deposition transcript of Wendy Olsen-Foxon, attached hereto as **Exhibit "E,"** p. 6).

65.     Ms. Olsen-Foxon's duties include retrieving inmate letters from the boxes in the cell houses through which the inmates request medical appointments or prescription refills. (See **Ex. "E,"** pp. 11 – 12).

66.     Watch-take medications are brought directly to inmates in their cells. (See **Ex. "E,"** p. 12). Ms. Olsen-Foxon does not deliver watch-take medications; she delivers "blister packs." Blister packs have a sticker with a date, and the packs are color coded, so an inmate knows when to turn in his sticker for a refill on a current prescription. (See **Ex. "E,"** p. 13).

67.     When Ms. Olsen-Foxon retrieves the inmate's refill stickers from the cell house, she then writes the prescription number on a form for medication refills and leaves the form in the pharmacy bin to be picked up by the pharmacy department. (See **Ex. "E,"** p. 15).

68.     Ms. Olsen-Foxon's current shift since July, 2014, is 7:00 a.m. to 3:00 p.m. Before that time, she was on the 3:00 p.m. to 11:00 p.m. (second) shift. She had the same duties on the second shift for handling the prescription refill stickers and distributing blister pack and maintenance medications, however, on second shift she would not perform the morning rounds

of emptying the letter boxes in the cell house. (See **Ex. "E,"** pp. 11, 15 – 16). Only registered nurses distribute watch-take medications. (See **Ex. "E,"** pp. 17 – 18).

69.     Regina Beattie is the Stateville pharmacy technician who handles the prescription refill stickers and sheets, and the prescriptions from the providers, for purposes of filling or refilling prescriptions. Ms. Beattie also provides the medical technicians with the "maintenance" medications for distribution to inmates when those medications arrive at Stateville. (See **Ex. "E,"** p. 24).

70.     Ms. Olsen-Foxon is not aware of any instances where a nurse or medical technician has received a refill sticker from an inmate and not put the sticker on a pharmacy refill sheet the same day. (See **Ex. "E,"** p. 28).

71.     Quite a few times, the Plaintiff has left Stateville on writs to go to court and will be transferred to Menard Correctional Center for a week or two during those times. (See **Ex. "E,"** pp. 39, 44).

72.     The Plaintiff complains a lot. (See **Ex. "E,"** p. 44, 50).

73.     Ms. Olsen-Foxon has not received many complaints from inmates that they are not getting their medications. (See **Ex. "E,"** pp. 46 – 47).

74.     As indicated on the MAR, the Plaintiff received the Motrin which he needed for the prescription that he had. Motrin is not intended to be taken every day, three times a day, unlike, for example, an antibiotic. The prescription for Motrin is written to be taken on an as needed basis. (See **Ex. "E,"** pp. 73 - 74).

75.     Ms. Olsen-Foxon is not aware of any employees at Stateville falsifying MAR forms. (See **Ex. "E,"** p. 75).

### B.      Regina Beattie

76.      Regina Beattie is employed by the IDOC as the pharmacy technician at Stateville. (See deposition transcript of Regina Beattie attached hereto as **Exhibit "F,"** p. 8). Her job duties include faxing prescriptions to Boswell, and receiving medications delivered to Stateville from Boswell. (See **Ex. "F,"** p 10). She also faxes non-formulary sheets to Boswell, and keeps track of the Stateville stock of needles and over-the-counter medications. (See **Ex. "F,"** p 10).

77.      For "keep on person" medications, it is the inmates' responsibility to give their prescription refill stickers to a nurse or a medical technician, or place them in a cell house mailbox. For watch-take medications, it is up to the nurses to pull the refill stickers from the medications for refills. (See **Ex. "F,"** p. 38). The nurses place the refill stickers on a refill form from Boswell. (See **Ex. "F,"** pp. 38 – 39).

78.      Medical technicians retrieve the prescription refill stickers from the boxes in the cell house. (See **Ex. "F,"** p. 39).

79.      Ms. Beattie has a basket in the urgent care department, and also outside her office door, where the nurses and medical technicians place the refill stickers and forms. Ms. Beattie picks up the stickers and forms from her box on a daily basis. (See **Ex. "F,"** p. 39). She then faxes the forms to Boswell the same day that she picks them up. (See **Ex. "F,"** pp. 40, 44).

80.      After a provider writes a prescription, they do not have any further involvement in the ordering of the medication, or the administration of the medication once it comes into Stateville. (See **Ex. "F,"** p. 50). Nor does the provider have any role in obtaining a refill of, medication for a current prescription. (See **Ex. "F,"** p. 51, 53).

81.     Ms. Beattie receives the medications from Boswell upon arrival at Stateville and then distributes the medications to the nurses and medical technicians for distribution to inmates in the cell houses. (See **Ex. "F,"** p 11).

82.     Upon receipt of the medications from Boswell, Ms. Beattie will sort the medications and place the medications in a bag, along with the MARs for the specific cell house, and then leave the bags in the urgent care department for the staff to distribute in the cell house. (See **Ex. "F,"** pp. 13 – 14, 16). The medications arrive at Stateville pre-packaged with the inmates' name and number on the package. (See **Ex. "F,"** pp. 13 – 14).

83.     For medications to be distributed in the morning, Ms. Beattie takes the medications received from Boswell and places them in carts in the "med room," for the nurses to distribute. (See **Ex. "F,"** p. 14). The med room is where the nurses pack their medications to distribute in the cell house for both the morning and afternoon shifts. Ms. Beattie puts the medications on the nurses' carts and the nurses distribute (pass) the medications in the cell house. (See **Ex. "F,"** pp. 15, 41 – 42).

84.     Ms. Beattie takes the medications to the med room the same day that she receives them. The medications arrive via U.P.S. at Stateville between 10:00 a.m. and 11:00 a.m. (See **Ex. "F,"** p. 15).

85.     When submitting prescription orders to Boswell, Ms. Beattie faxes a copy of the prescription itself to Boswell. She keeps a copy of the faxed prescription and the fax confirmation in her office for two years. (See **Ex. "F,"** pp. 18 – 20).

86.     There are separate MAR forms for watch-take medications, which are kept by the nurse who distributes those medications. (See **Ex. "F,"** pp. 24 – 25).

87.     It is up to the nurses who pass watch-take medications to turn in a refill sticker (to Ms. Beattie) when a prescription is due for a refill. The nurses place the refill stickers on refill sheets and Ms. Beattie then faxes the sheets to Boswell. (See **Ex. "F,"** p. 26).

88.     Boswell sends pre-printed MAR forms to Ms. Beattie every month. The MAR forms that are not pre-printed are created by the nurses at Stateville for watch-take medications. (See **Ex. "F,"** p. 31). Boswell also sends pre-printed MARs for the watch-take medications. Ms. Beattie keeps the pre-printed MARs in her office. (See **Ex. "F,"** p. 32). Boswell only sends one set of pre-printed MARs to Stateville. (See **Ex. "F,"** p. 33).

89.     If a nurse places her initial on a MAR under a date, that indicates the nurse gave the medication to the inmate on that date. (See **Ex. "F,"** p. 36).

90.     All of the medications that the Plaintiff is claiming he did not receive are watch-take medications. (See **Ex. "F,"** p. 43).

## C.      Marcus Hardy

91.     Marcus Hardy worked at Stateville from October, 2009, through December, 2012. (See deposition transcript of Marcus Hardy attached hereto as **Exhibit "G,"** p. 6). He was the assistant warden of programs from October, through December of 2009. In December of 2009, he became the warden of the facility. (See **Ex. "G,"** pp. 8 – 9).

92.     The healthcare unit administrator is the person in charge of pharmaceuticals, prescriptions, medications, and corrective lenses at Stateville. When Warden Hardy arrived at Stateville in 2009, the healthcare unit administrator was Linda Young. The position was then held by Royce Brown-Reed, who still held the position at the time of the Warden's departure from Stateville. (See **Ex. "G,"** p. 12). The healthcare unit administrator would report to the assistant warden of programs at the facility. (See **Ex. "G,"** p. 17).

93.     Warden Hardy relied upon the healthcare unit administrator to ensure that medications prescribed by physicians at Stateville were provided to the inmates. (See **Ex. "G,"** p. 40). Warden Hardy also relied upon the healthcare unit administrator to ensure that when medications already prescribed would be refilled for inmates as needed. (See **Ex. "G,"** pp. 40 – 41).

94.     Warden Hardy did not recall ever hearing any comments from the healthcare unit administrator indicating a problem with not providing medications to inmates as prescribed. (See **Ex. "G,"** p. 19).

95.     The process for ordering medications at Stateville involves IDOC personnel placing the order to the outside pharmacy, Boswell. (See **Ex. "G,"** p. 38).

**D.     Darryl Edwards**

96.     Darryl Edwards was a shift commander at Stateville from November, 2008, through September, 2010, at which time he became the assistant warden of programs at the facility. He held that position until August, 2012. (See deposition transcript of Darryl Edwards attached hereto as **Exhibit "H,"** pp. 8 - 10).

97.     During the time that Mr. Edwards was the assistant warden of programs, Royce Brown-Reed, the healthcare unit administrator, was in charge of the healthcare unit at Stateville. (See **Ex. "H,"** p. 11).

98.     The pharmacy technician at Stateville is in charge of ensuring that medications remain in stock at the facility, and ordering and restocking medications after they are prescribed by a physician. (See **Ex. "H,"** p. 29). If Mr. Edwards was told that an inmate claimed he did not receive his medication, or that the medication was out of stock, Mr. Edwards would forward that matter to the healthcare unit administrator. (See **Ex. "H,"** pp. 29 – 30).   The healthcare unit

administrator would then take the matter up with the pharmacy technician. (See **Ex. "H,"** p. 30). From January of 2010, through the present, the healthcare unit administrator was Royce Brown-Reed, an IDOC employee. (See **Ex. "H,"** pp. 30, 31). The pharmacy technician, Regina Beattie, is also an IDOC employee. (See **Ex. "H,"** p. 32).

### E.    Charles Fasano

99.    Charles Fasano began working with the IDOC in September, 2010. (See deposition transcript of Charles Fasano attached hereto as **Exhibit "I,"** p. 10). His title at that time was agency medical coordinator. (See **Ex. "I,"** p. 11). He would assist the agency medical director, Dr. Louis Shicker. (See **Ex. "I,"** pp. 12 – 13).

100.    Issues with inmates receiving their medications, which occurred very intermittently, would be brought to Mr. Fasano's attention. (See **Ex. "I,"** p. 16).

101.    The pharmacy technician is responsible for maintaining the pharmacy/medication room at Stateville. (See **Ex. "I,"** p. 42).

102.    There are IDOC policies, referred to as administrative directives and institutional directives, for ensuring that medications are in stock and recorded at Stateville. (See **Ex. "I,"** p. 43).

103.    The drug formulary is an IDOC-created list of drugs available to inmates, which is periodically approved and updated by the IDOC medical director, Dr. Shicker. (See **Ex. "I,"** p. 52).

104.    Inmates do not like when providers want them to be off of certain medications for a period of time; inmates wanted "to play doctor." (See **Ex. "I,"** p. 57).

## VI.    Testimony of Wexford Witnesses

**A.    Saleh Obaisi, M.D.**

105.    Dr. Obaisi has been the medical director at Stateville since August of 2012. (See deposition transcript of Saleh Obaisi, M.D., attached hereto as **Exhibit "J,"** p. 20). He has worked for Wexford since 2005. (See **Ex. "J,"** p. 20).

106.    The Plaintiff has chronic pain in his shoulder and knees. (See **Ex. "J,"** p. 10). Dr. Obaisi previously ordered a lumbar spine X-ray for the Plaintiff, which showed mild arthritic changes; based on the test result the decision was made to treat the Plaintiff conservatively. (See **Ex. "J,"** pp. 10 - 11). The Plaintiff also had an X-ray of his knees, which was returned negative. (See **Ex. "J,"** pp. 11 - 12).

107.    The Plaintiff received Motrin/Meloxicam and Tramadol for pain. (See **Ex. "J,"** p. 26).   Tramadol, unlike Motrin, is not an anti-inflammatory. Tramadol works directly on the nervous system to numb the area of the pain sensation. It is similar to a narcotic. (See **Ex. "J,"** pp. 26, 28).

108.    Dr. Obaisi is hesitant and careful in prescribing Tramadol. (See **Ex. "J,"** p. 27). Tramadol is classified by the FDA as potentially addictive. (See **Ex. "J,"** p. 27). In Dr. Obaisi's opinion, he needs a very good reason to put a patient on Tramadol and he does not like patients to use the medication for a long time. It is his preference to stop Tramadol for a patient every once in a while, or not automatically renew it, until the patient's condition can be re-evaluated. (See **Ex. "J,"** pp. 28, 34). Because of his concerns with keeping patients on Tramadol long-term, Dr. Obaisi prefers to have a patient off of the medication for a period of time to see if they can do well without the medication, or on other medications. (See **Ex. "J,"** pp. 34 – 36). The trend today is to treat Tramadol as a narcotic, a controlled substance (the U.S. Government considers

Tramadol to be a controlled substance and a narcotic. *See* http://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf). (See **Ex. "J,"** p. 36). Tramadol is habit-forming, and studies have started to show that it is addictive. (See **Ex. "J,"** p. 47, 49). There is also a concern of a breathing disorder as a side effect of the medication. (See **Ex. "J,"** p. 58).

109.    The Plaintiff likely has inflammation in his shoulder and knees. He does not have a tear in the rotator cuff. (See **Ex. "J,"** p. 28). The Plaintiff's condition is tendinitis, inflammation of the tendons in his knees, due to his weight and the wearing down of cartilage. (See **Ex. "J,"** p. 29). In Dr. Obaisi's opinion, Meloxicam, Motrin, and Naproxen are the ideal medications for the Plaintiff. (See **Ex. "J,"** p. 29).

110.    Tramadol does not require a build-up in taking the medication, in order to be effective. It works on a temporary basis for eight to ten hours and at the time it is taken. (See **Ex. "J,"** p. 31).

111.    Patients often believe, incorrectly, that because they are prescribed a certain medication at one point in time, that they will receive the medication indefinitely. (See **Ex. "J,"** p. 39).

112.    Dr. Obaisi does not recall ever prescribing Tramadol during the five years that he was the medical director at Logan Correctional Center. (See **Ex. "J,"** p. 40).

113.    Non-steroidal anti-flammatories (NSAIDs) should be the first line of treatment for conditions of musculoskeletal, bone, tendon, and muscle pain, to relieve inflammation. (See **Ex. "J,"** p. 46). In Dr. Obaisi's practice, he uses narcotics as a last resort medication for treatment of pain. If NSAIDs are not effective, he will choose a steroid injection before a narcotic. (See **Ex. "J,"** pp. 46 – 47).

114.    The Plaintiff's shoulder condition is chronic tendinitis, or a bursitis condition. (See **Ex. "J,"** p. 50).

115.    Dr. Obaisi does not have any evidence of a diagnosis of a cartilage, ligament, tendon, or bursa problem in the Plaintiff's knees. (See **Ex. "J,"** p. 50).

**B.      Parthasarathi Ghosh, M.D.**

116.    Dr. Ghosh was the medical director at Stateville Correctional Center from 2003 through the end of March, 2011. (See Dr. Ghosh's deposition transcript attached hereto as **Exhibit "K,"** pp. 6, 26). He is board certified in endocrinology. (See **Ex. "K,"** p. 21).

117.    As medical director, Dr. Ghosh would not be involved in reviewing most inmate grievances, unless it is a special circumstance which is brought to his attention. (See **Ex. "K,"** p. 13 - 14).

118.    There is a treatment protocol for inmates in the healthcare unit, which is provided by the IDOC agency medical director. (See **Ex. "K,"** p. 44). The treatment protocol applies to medical technicians and nurses. (See **Ex. "K,"** pp. 45 – 46).

119.    Wexford has some policies relative to treatment of particular medical problems or diseases, however, the treatment of inmates is left to the medical judgment of the independent medical providers. (See **Ex. "K,"** pp. 47 - 49). Any treatment protocols provided by Wexford are superseded by the State (IDOC) protocols. (See **Ex. "K,"** p. 51).

120.    The State also provides the administrative directives for the healthcare unit, which contain mandatory requirements. (See **Ex. "K,"** p. 54).

121.    Dr. Ghosh did not have the authority to approve or disapprove prescriptions for contact lenses. His role was to relay a recommendation for lenses from the optometrist to the Wexford collegial review process, which would then provide approval for the lenses. (See **Ex.**

**"K,"** pp. 57 – 58). Orders for inmates' eye glasses usually do not go through the collegial review process. Approval is only needed through collegial review, for contact lenses. (See **Ex. "K,"** p. 60). A request for contact lenses was never denied by Wexford's collegial review. (See **Ex. "K,"** p. 63).

122. Dr. Ghosh was not involved in ordering glasses or contact lens wetting solution. Those orders would be done by the optometrists themselves. (See **Ex. "K,"** pp. 60 – 62).

123. Dr. Ghosh recalled that Wexford approved the Plaintiff's contact lenses through the collegial review process. (See **Ex. "K,"** p. 12).

124. The Plaintiff's contacts ordered on March 5, 2010, were approved by Wexford, and received on April 22, 2010. (See **Ex. "K,"** pp. 146 – 147). Wexford also approved replacement lenses for the Plaintiff in January, 2011. (See **Ex. "K,"** p. 147).

125. Dr. Ghosh had no recollection of ever denying or overriding the recommendation of an optometrist, and every time the doctor received such a request, he passed it on to Wexford for approval. (See **Ex. "K,"** p. 94, 95).

126. Dr. Ghosh did not have any involvement with running the pharmacy at Stateville and he was not responsible for keeping medications in stock at Stateville. (See **Ex. "K,"** p. 66). The pharmacist and pharmacy technician run the pharmacy at Stateville, they are State employees. (See **Ex. "K,"** pp. 66 – 68).

127. The process for obtaining a medication is for a provider to order a prescription, a nurse to countersign the prescription and then place it in the box for the local (onsite) pharmacy at Stateville. The local pharmacy will then fax the order from Stateville to Boswell. Boswell will then send the medication to Stateville. (See **Ex. "K,"** pp. 71 – 72).

128.    Tramadol is not a medication given routinely at Stateville and a patient must be evaluated before receiving a prescription for Tramadol. (See **Ex. "K,"** p. 71). Tramadol is a strong pain medication, a synthetic opiate. (See **Ex. "K,"** p. 73).

129.    Tramadol is a very strong medication and it can be used by inmates to commit suicide. (See **Ex. "K,"** p. 155). With a pain medication such as Tramadol, it is best to prescribe it for a limited amount of time and then reevaluate the patient prior to a prescription renewal. (See **Ex. "K,"** p. 155).

130.    If the Plaintiff had chronic pain in his shoulder, most of the time, NSAIDs (non-steroidal anti-inflammatories) such as Ibuprofen or Naprosyn would be prescribed and Tramadol would not be needed to treat the pain all of the time. (See **Ex. "K,"** p. 74). The Plaintiff wanted to have Tramadol. (See **Ex. "K,"** p. 75).

131.    In Dr. Ghosh's practice, with a patient having a similar presentation to the Plaintiff's, Tramadol would not be the doctor's first medication to use. He would use NSAIDs such as Ibuprofen or Naprosyn. (See **Ex. "K,"** pp. 77 – 78). Tramadol is akin to a narcotic drug and it is a controlled substance. (See **Ex. "K,"** p. 101). Dr. Ghosh compared the effect of Tramadol to Morphine – and patients like to have it. (See **Ex. "K,"** p. 78). There is a potential for addiction to Tramadol if taken regularly. (See **Ex. "K,"** p. 78).

132.    If an inmate has a prescription that has expired, he will need to make a sick call request to a medical technician to be seen by a provider or obtain a renewal. Sick call requests by inmates are not denied. (See **Ex. "K,"** p. 84). A medical technician does not have the authority to disregard a sick call request received from an inmate. (See **Ex. "K,"** p. 141).

133.    In Dr. Ghosh's practice, if he evaluates a patient who is in pain and the doctor does not want to continue Tramadol, he will write an order for another pain medication. (See **Ex. "K,"** p. 86).

134.    In the case of a watch-take medication, such as Tramadol, the inmate is told the length of the prescription order. (See **Ex. "K,"** p. 103). In cases where the prescription order is still current for an NSAID, a non-watch take, the inmate will turn in the medication sticker for renewal, to the medical technician. (See **Ex. "K,"** p. 103).

135.    Inmates are always told, for a pain medication such as Tramadol, that the prescription will not be renewed absent a subsequent evaluation by a medical provider. (See **Ex. "K,"** p. 104, 105). The inmates know that if there is no sticker for a prescription refill, the medication will need a new prescription order. (See **Ex. "K,"** p. 104).

136.    When he came in to see Dr. Ghosh, the Plaintiff did not ask for a higher dosage of Tramadol. (See **Ex. "K,"** p. 110). There was a risk that if the Plaintiff continued taking Tramadol for a longer period of time, especially if his dosage was increased, that he could become addicted to the medication. (See **Ex. "K,"** p. 110).

137.    A nurse's note dated January 23, 2010, indicates that the Plaintiff refused a nursing assessment and preliminary examination. (See **Ex. "K,"** pp. 117 – 120). The Plaintiff arrived for his current stint at Stateville with an order for Tramadol, once daily, 50 milligrams. (See **Ex. "K,"** p. 125). The order was for 30-days and then to be discontinued. (See **Ex. "K,"** p. 126).

138.    The Plaintiff was still receiving Tramadol when Dr. Ghosh left in March, 2011. (See **Ex. "K,"** p. 108). In fact, Dr. Ghosh renewed the Plaintiff's prescription for Tramadol the

day before his last day working at Stateville. (See **Ex. "K,"** p. 108). Dr. Ghosh renewed the Plaintiff's Tramadol for the period of April 1 – 30, 2011. (See **Ex. "K,"** p. 100).

139.     There is no indication in the medical records of any clinical visits between Dr. Ghosh and Plaintiff between June 2010, and March, 2011. (See **Ex. "K,"** p. 115, 129).

140.     When Dr. Ghosh prescribed Tramadol for the Plaintiff, the order was intended for a limited amount of time. (See **Ex. "K,"** p. 101). After the Plaintiff's prescription orders expire, it would be incumbent upon the Plaintiff to request an appointment with the medical staff for a new order. (See **Ex. "K,"** p. 102). These appointments would generally be with the physician assistant. (See **Ex. "K,"** pp. 102, 118).

141.     Providers would generally not write a 3-month prescription for Tramadol, ordering it instead in a smaller time span, and allowing for the patient to be assessed prior to renewal. (See **Ex. "K,"** p. 134, 135).

## C.     Imhotep Carter, M.D.

142.     Dr. Carter is board certified in correctional medicine and urgent care. (See deposition transcript of Dr. Carter attached hereto as **Exhibit "L,"** pp. 13 – 14, 29). He worked for Wexford as the site medical director at Stateville from July, 2011, through May 13, 2012. (See **Ex. "L,"** p. 25, 31). While Dr. Carter was at Stateville the healthcare unit administrator was Royce Brown-Reed. (See **Ex. "L,"** pp. 32 – 33). The pharmacy technician during that time was Regina Beattie. (See **Ex. "L,"** p. 40).

143.     Dr. Carter did not have any responsibility for hiring or firing, or assigning job duties to, the healthcare unit administrator or pharmacy technician. (See **Ex. "L,"** p. 41). The nursing and pharmacy departments had their own internal structure for their tasks, for which Dr. Carter was not responsible. (See **Ex. "L,"** pp. 42 – 43).

144.    Dr. Carter did not have any recollection of the Plaintiff's Tramadol prescriptions not being timely renewed. (See **Ex. "L,"** p. 52).

145.    The medical records indicate that one of the reasons that the Plaintiff came to see Dr. Carter was for a medication renewal, and Dr. Carter renewed the prescription. (See **Ex. "L,"** pp. 52 – 53). Dr. Carter also offered the Plaintiff an injection for his shoulder pain, which the Plaintiff declined. (See **Ex. "L,"** pp. 55 – 56). The Plaintiff was also enrolled in physical therapy for his shoulder at Stateville. (See **Ex. "L,"** p. 56).

146.    Dr. Carter increased the Plaintiff's dosage of Tramadol. (See **Ex. "L,"** p. 57). Dr. Carter had no recollection of the Plaintiff complaining to him about his Tramadol prescription expiring in November, 2011. (See **Ex. "L,"** pp. 58 – 59).

147.    Dr. Carter did not have any recollection of lowering the Plaintiff's Tramadol prescription from 100 milligrams in the evening to 50 milligrams in the evening, in November, 2011; the doctor did not see anything in the medical records that he took that action. (See **Ex. "L,"** pp. 62 – 63).

148.    Grievances that came into the healthcare unit at Stateville would initially be handled by the healthcare unit administrator and she would contact Dr. Carter only if there was some element of a particular grievance that she needed guidance on. (See **Ex. "L,"** p. 63).

149.    Prescription orders written by providers at Stateville would go to the pharmacy technician, Regina Beattie, for transmittal to Boswell. (See **Ex. "L,"** p. 69).

150.    Dr. Carter ordered a renewal of the Plaintiff's Tramadol of 50 milligrams in the morning and 100 milligrams in the evening. (See **Ex. "L,"** p. 72). Dr. Carter had also ordered a November, 2011, prescription for the Plaintiff of 50 milligrams of Ultram twice daily. (See **Ex. "L,"** p. 75).

151.    Dr. Carter was not involved in the process of scheduling patients for clinical appointments at Stateville. (See **Ex. "L,"** pp. 74 - 75).

152.    On January 27, 2012, Dr. Carter increased the Plaintiff's Ultram dosage from 50 milligrams twice a day to 100 milligrams twice a day. (See **Ex. "L,"** p. 82). Dr. Carter makes his decisions for treatment (including prescription orders) based on his assessment of a patient at the time of the decision. (See **Ex. "L,"** p. 82).

153.    The custom would be for an inmate-patient to be evaluated by a medical provider at Stateville before receiving a renewed prescription for Tramadol. (See **Ex. "L,"** p. 89).

154.    Dr. Carter was not involved in prescribing psych medications, such as Benadryl (for sleep) for the Plaintiff. (See **Ex. "L,"** pp. 90, 93). He also did not handle eye related issues, which were handled by the optometrist at Stateville. (See **Ex. "L,"** p. 94).

155.    Risks associated with continued chronic use of Tramadol include gastrointestinal (G.I.) bleeding and hemorrhage, kidney damage, and addiction. Dr. Carter's preference would be to treat a patient with the lowest possible dosage necessary to obtain the desired effect. (See **Ex. "L,"** pp. 95 – 96).

156.    Nobody at Stateville ever brought to Dr. Carter's attention any issues with Stateville employees stealing medication from the pharmacy. (See **Ex. "L,"** p. 97).

157.    Dr. Carter is not aware of patients having withdrawal symptoms after being taken off of Tramadol. (See **Ex. "L,"** p. 97).

**D.      Ronald Schaefer, M.D.**

158.    Dr. Schaefer has been employed by Wexford as a physician since 2004. (See deposition transcript of Dr. Schaefer attached hereto as **Exhibit "M,"** p. 16). He was a staff physician at Stateville from August, 2010, through the end of October, 2011. (See **Ex. "M,"** p.

11). His duties at Stateville included seeing patients in chronic disease clinics, as well as in the sick call clinic. (See **Ex. "M,"** p. 11). The sick call clinic would also be handled by other medical providers at Stateville. (See **Ex. "M,"** p. 84). Dr. Schaefer was not involved in the process of scheduling inmates to be seen in the healthcare unit. (See **Ex. "M,"** p. 83).

159.    Pain medication, such as Tramadol, is appropriate to use for pain relief only for periods of time. (See **Ex. "M,"** p. 22). After taking the medication for a prescribed period of time, a patient should be reevaluated before continuing on with the medication. (See **Ex. "M,"** pp. 23 – 24, 30). In Dr. Schaefer's opinion, pain medication is not a continuous, or nonstop, type of medication (as compared to diabetes or hypertension medications), in part because of the side effects such medications cause. (See **Ex. "M,"** pp. 25, 28). Pain medications can also decrease the threshold for pain to the point that a patient's perception of pain is enhanced. (See **Ex. "M,"** p. 25). Tramadol is not a drug of choice for Dr. Schaefer to prescribe. (See **Ex. "M,"** p. 85).

160.    Because inmate patients frequently assume that pain medications such as Tramadol are permanent medications, it was Dr. Schaefer's practice to inform his patients that such medications are not ordered or recommended by the providers to be nonstop. (See **Ex. "M,"** p. 28, 39).

161.    Dr. Schaefer prescribed Tramadol for the Plaintiff because the Plaintiff had been on the medication in the past; Dr. Schaefer would generally not choose Tramadol as a pain medication to prescribe for his patients. (See **Ex. "M,"** p. 31, 43).

162.    If, after the Plaintiff's limited period of a medication ran out, the Plaintiff could request a follow-up appointment to be seen by a provider. In the meantime, he could request Tylenol or Ibuprofen from medical technicians who make daily rounds through the cell house. (See **Ex. "M,"** pp. 32 – 33). If an inmate continues to have pain, the procedure is for him to ask

for an appointment in the sick call clinic. (See **Ex. "M,"** pp. 35, 47). Medical technicians are the health care employees with whom inmates most regularly interface. (See **Ex. "M,"** p. 83, 93).

163.    Dr. Schaefer has no recollection of ever being told that the pharmacy at Stateville had run out of certain medications. (See **Ex. "M,"** p. 37). He also had no recollection of ever being notified that a patient wanted to see him and the request being denied by medical technicians. (See **Ex. "M,"** p. 50).

164.    Dr. Schaefer never refused to prescribe Tramadol to the Plaintiff after seeing the patient in clinic. (See **Ex. "M,"** pp. 51 – 52).

165.    Dr. Schaefer ordered a physical therapy evaluation for the Plaintiff, to be performed by the Stateville physical therapist. (See **Ex. "M,"** p. 55).

166.    Dr. Schaefer wrote a prescription for the Plaintiff's Tramadol to be taken twice a day, for 30 days, on August 24, 2010; he also discontinued the Plaintiff's Indocin medication at that time. (See **Ex. "M,"** p. 61).

167.    Dr. Schaefer then wrote a prescription for the Plaintiff's Tramadol to be taken twice a day, for six weeks, in October, 2010 (for shoulder pain). (See **Ex. "M,"** pp. 67- 68).  The Plaintiff weighed 308 pounds and was severely obese. (See **Ex. "M,"** p. 88). When Dr. Schaefer saw the Plaintiff on October 19, 2010, the Plaintiff complained of diarrhea, but did not otherwise make any non-associated complaints of pain. (See **Ex. "M,"** p. 86). Dr. Schaefer did not see the Plaintiff in clinic following the October, 2010, visit. (See **Ex. "M,"** p. 87).

168.    Prescribing, and renewing prescriptions of, Tramadol was left up to the medical judgment of the individual providers at Stateville. (See **Ex. "M,"** p. 80).

169.    The medical records indicate that the Plaintiff was seen by Physician Assistant LaTanya Williams on January 3, 2011, and she wrote a prescription for Tramadol, 100

milligrams twice a day, for one month. (See **Ex. "M,"** p. 89). She then saw the Plaintiff on February 24, 2011, and she wrote a prescription for Tramadol, 100 milligrams twice a day, for one month. (See **Ex. "M,"** pp. 89 – 90).

**E.     Arthur Funk, M.D.**

170.    Dr. Funk is the regional medical director for Wexford Health Sources, Inc. (See deposition transcript of Dr. Funk attached hereto as **Exhibit "N,"** p. 8).

171.    The recommendation for Tramadol is to be taken intermittently for pain and only as needed for pain, and not on a regular basis. Tramadol is not designed to be taken as a maintenance medication on a daily basis. (See **Ex. "N,"** p. 31).

172.    A high daily dose of Tramadol is 400 milligrams per day. A low dose would be 50 or 100 milligrams per day. (See **Ex. "N,"** pp. 32 - 33).

173.    In 2011, Tramadol was reclassified by the NIH as a narcotic-like substance. (See **Ex. "N,"** pp. 36 – 37). It is a non-opiate, but has narcotic-like properties and addictive potential. (See **Ex. "N,"** p. 37).

174.    All of the Plaintiff's medications at issue in this case are considered watch-take medications at Stateville. (See **Ex. "N,"** p. 48).

175.    Dr. Funk wrote a medication order for the Plaintiff's Tramadol on June 14, 2011, for 50 milligrams in the morning and 100 milligrams at night, for two months. (See **Ex. "N,"** p. 58). The plan was to have the Plaintiff in for a follow-up visit in six weeks. Dr. Funk's reason for this order was likely to start tapering the Plaintiff off of the Tramadol and to continue that process. (See **Ex. "N,"** p. 63). The doctor also prescribed Tylenol, 325 milligrams four times per day as needed, with two refills until September 1, 2011. (See **Ex. "N,"** p. 64).

176.    The pharmacy technician at Stateville disseminates the medications – she is a State employee. (See **Ex. "N,"** p. 74). She will process the medication as it comes in, divide it up to the areas in the facility where it will go, and give it to the individuals who dispense the medications. The pharmacy technician will also perform the paperwork and verify that medications were received at Stateville. The pharmacy technician is charged with replenishing stock medications. (See **Ex. "N,"** pp. 80 – 82). The nurses at Stateville who dispense medication to inmates are State and Wexford employees, and the division of State versus Wexford personnel is approximately 50/50. (See **Ex. "N,"** p. 75).

177.    There are numerous ways that an inmate can request to be seen by a medical provider for medical issues: with a written request; a verbal request through a medical technician or a nurse; or, in an emergency, through the galley correctional officer. (See **Ex. "N,"** p. 78).

**F.      LaTanya Williams, P.A.**

178.    Ms. Williams is a physician assistant for Wexford Health Sources, Inc., at Stateville Correctional Center. (See deposition transcript of LaTanya Williams attached hereto as **Exhibit "O,"** p. 7). As a physician assistant, Ms. Williams handles the inmate sick call, covers urgent care, performs chronic condition clinics, and conducts annual physicals for inmates. (See **Ex. "O,"** p. 7). Ms. Williams has seen the Plaintiff several times as a patient on her sick call and she has written several prescriptions for him. (See **Ex. "O,"** pp. 15 – 16).

179.    Ms. Williams did not have any role in the grievance procedure at Stateville. (See **Ex. "O,"** p. 32). She is not involved in dispensing medications to inmates and has never dispensed a watch-take medication to inmates at Stateville. (See **Ex. "O,"** p. 33). The nurses distribute watch-take medications. (See **Ex. "O,"** p. 33). Ms. Williams does not have any involvement with the medical administration record (MAR) for patients. (See **Ex. "O,"** p. 43).

180.     In an instance where Ms. Williams would write a prescription for the Plaintiff for Motrin, if the medication would not be received for a few days, she would provide him with a small package of medications for his use, until the fill order for his prescription arrives on site. (See **Ex. "O,"** pp. 46 – 47).

181.     Ms. Williams does not have any involvement with the ordering of contact lenses for inmates. (See **Ex. "O,"** p. 55).

182.     Ms. Williams' practice is that when she is presented with a request for a medication refill, she will look back at the patient's chart to see the length of time the patient has been on the medication and the "prescribing habits" of the physician who ordered the medication. (See **Ex. "O,"** p. 58). Ms. Williams may refill a medication without having to see the patient before issuing the order. (See **Ex. "O,"** p. 59).

183.     On January 3, 2011, Ms. Williams wrote a prescription order for Tramadol 100 milligrams twice a day for 30 days. (See **Ex. "O,"** pp. 64 – 65).

184.     Ms. Williams was not notified of the Plaintiff being out of Tramadol at any time from February 2, through February 24, 2011. (See **Ex. "O,"** p. 67). If this was an issue and it had been brought to her attention, she would have written the Plaintiff a prescription and not waited three weeks to see him. (See **Ex. "O,"** p. 67).

185.     On February 24, 2011, Ms. Williams wrote a prescription for Tramadol 100 milligrams, B.I.D. (two times per day), for one month (See **Ex. "O,"** p. 62, 64). At that time, she saw the Plaintiff in the clinic and assessed him as having alteration in comfort in the knee. (See **Ex. "O,"** pp. 62, 66).

186.     On August 15, 2011, Ms. Williams assessed the Plaintiff as having chronic shoulder pain. (See **Ex. "O,"** p. 63). She wrote a prescription for Tramadol 50 milligrams in the

morning and 100 milligrams at the hour of sleep, for one week. (See **Ex. "O,"** p. 63). The prescription was for one week because the Plaintiff had an upcoming appointment with the medical director in three days. (See **Ex. "O,"** p. 64).

187.     After Ms. Williams writes a prescription for an inmate, she does not have any further involvement in the processing, ordering, handling, or subsequent distribution of the medication prescribed. (See **Ex. "O,"** pp. 69, 72).

188.     The general practice for Ms. Williams to see an inmate clinically is for the inmate to place a sick call request and to be placed on Ms. Williams' schedule. (See **Ex. "O,"** pp. 70 – 71). Ms. Williams never refused to see the Plaintiff in clinic. (See **Ex. "O,"** p. 73).

189.     If an inmate's Tramadol prescription expires, at some point, the inmate will need to be seen by a doctor to have the prescription renewed. (See **Ex. "O,"** p. 74). With a drug such as Tramadol, patients may require different dosage levels, and may not need the medication indefinitely, so they will need to be evaluated by a physician. (See **Ex. "O,"** pp. 74 – 75).

**G.     Tiffany Utke, L.P.N.**

190.     Nurse Utke is a licensed practical nurse ("L.P.N."). (See deposition transcript of Tiffany Utke, L.P.N., attached hereto as **Exhibit "P,"** p. 7). She is employed by Wexford and has worked as an L.P.N. in the healthcare unit at Stateville since 2007. She has worked part-time on an as-needed basis since February, 2008. (See **Ex. "P,"** pp. 9 – 10, 12). Nurse Utke worked in the optometry clinic very often for her first few years of employment at Stateville. (See **Ex. "P,"** pp. 47 – 48). Thereafter, she would be assigned to work in different departments within the facility. (See **Ex. "P,"** pp. 48 – 49).

191.     Eye glasses for Stateville inmates are ordered from Dixon Correctional Center. Contact lens solution is provided through the pharmacy. (See **Ex. "P,"** pp. 30 – 31). There is a

form utilized at Stateville to document when an inmate receives eye glasses or contact lenses. The form is signed by the inmate receiving the glasses or contacts. (See **Ex. "P,"** pp. 31 – 32).

192.     Conversations that Nurse Utke has had with the Plaintiff in the past have occurred in the clinic and were about the Plaintiff's glasses or contacts. The Plaintiff would say that his glasses or contacts did not work or he would ask when he would be receiving them. (See **Ex. "P,"** p. 37).

193.     Inmates can submit a sick call request to be seen in the optometry department at Stateville. (See **Ex. "P,"** pp. 37 – 38). In the few instances where Nurse Utke received a request from the Plaintiff, she would add the Plaintiff to the optometrist's schedule for an appointment, or speak with the optometrist directly to determine when the Plaintiff could be seen. (See **Ex. "P,"** pp. 39 – 40).

194.     During the times that Nurse Utke received a request or complaint from the Plaintiff that his contacts or glasses were not working, she followed the procedure of putting the Plaintiff on the schedule to see the optometrist. (See **Ex. "P,"** pp. 41 – 42).

195.     There were occasions when the optometrist at Stateville placed the Plaintiff ahead of other inmates on the schedule, prioritizing him ahead of the first-come-first-served scheduling process. (See **Ex. "P,"** pp. 42, 92).

196.     The optometrist, Dr. Patterson would make the determination on whether to place the Plaintiff on the optometry schedule. Nurse Utke never evaluated or examined the Plaintiff. (See **Ex. "P,"** p. 92).

197.     It is not common for patients in the Stateville optometry clinic to have contact lenses; it is, in fact, very rare. (See **Ex. "P,"** p. 93). During the three to four years that Nurse

Utke was the nurse in the optometry clinic, only one other inmate besides the Plaintiff had contact lenses. (See **Ex. "P,"** p. 94).

198.    In the optometry department, the Plaintiff was considered a special case since he would complain and he would constantly state that his contacts did not work. The Plaintiff was seen very frequently as compared to other patients. (See **Ex. "P,"** pp. 42 – 43, 54). Nurse Utke received more complaints from the Plaintiff as compared to other patients in the optometry department. (See **Ex. "P,"** p. 91). She never ignored any of the written complaints submitted by the Plaintiff. (See **Ex. "P,"** p. 91).

199.    If the Plaintiff's optometry prescription was coming up, Nurse Utke would schedule him to be seen ahead of time in order to keep the Plaintiff's supply of contacts going. (See **Ex. "P,"** p. 55).

200.    Other than distributing the Plaintiff's contacts and contact solution to him, Nurse Utke did not provide any other medical services to the Plaintiff. (See **Ex. "P,"** pp. 44 - 46).

201.    Nurse Utke has not directly received any notes or internal mail from the Plaintiff. (See **Ex. "P,"** p. 89).

**H.    Heidi Moss, R.N.**

202.    Nurse Moss worked for Wexford from 2010 through 2012, as a nurse supervisor at Stateville. Her job duties involved scheduling employees, answering grievances, and assisting in the infirmary. She would also perform inmate intakes and releases at the processing center. (See deposition transcript of Heidi Moss, R.N., attached hereto as **Exhibit "Q,"** pp. 8 – 9). Her job at Stateville did not include dispensing medications or optical products to inmates. (See **Ex. "Q,"** pp. 10, 40, 29). She is currently employed as an assistant director of nursing at a long-term and behavioral health facility. (See **Ex. "Q,"** p. 7).

203.     Nurse Moss's role in the grievance process at Stateville would be to, upon receipt of an inmate grievance, review the patient's medical chart, and if necessary, speak with a provider, in order to determine the status of the issue raised in the grievance. If it appeared that there was a substantiated complaint, she would attempt to come up with a solution to correct the problem. (See **Ex. "Q,"** pp. 22 – 23).

204.     Nurse Moss received grievances in the box in her office. She was unaware of the process of how the grievances came to her or how they were handled after her role in the response was completed. (See **Ex. "Q,"** pp. 15, 58). Nurse Moss always tried to answer the grievances daily as they came to her. (See **Ex. "Q,"** p. 17). She would receive grievances approximately three days a week, less than 10 grievances per day. (See **Ex. "Q,"** pp. 18, 20). She would complete her role in responding to a grievance within three days of receiving the grievance in her box. (See **Ex. "Q,"** p. 35).  Nurse Moss had no control over the amount of time it would take from when an inmate filed a grievance until it reached her desk. (See **Ex. "Q,"** p. 83).

205.     After she completed her role in assisting with responding to a grievance, she would fill out the bottom of the offender's grievance sheet and return it to the secretaries in the healthcare unit. (See **Ex. "Q,"** p. 40). She was not aware of what steps the secretaries would then take with the grievance. (See **Ex. "Q,"** pp. 41, 69). Nurse Moss never typed-up any part of her findings when assisting in answering a grievance. (See **Ex. "Q,"** p. 58).

206.     Nurse Moss did not have a role in making sure that healthcare unit nurses had the medication that they were to dispense to inmates. (See **Ex. "Q,"** p. 41). The pharmacy technician would divide up the medications by cell house for the nurses to dispense. (See **Ex. "Q,"** p. 43).

207.    If Nurse Moss was assisting in responding to a grievance and saw on a MAR that a medication was not given, she would follow-up with the nurse to make sure an inmate received the medication. (See **Ex. "Q,"** pp. 30 – 31).

208.    Nurse Moss assisted in responding to certain grievances by the Plaintiff concerning his medications. (See **Ex. "Q,"** pp. 61 – 68, 70 - 71). Nurse Moss did not prepare any of the type-written responses to the grievances. (See **Ex. "Q,"** p. 68). The grievance process and procedure was put into place by IDOC; Wexford did not put the grievance procedure at Stateville into place. (See **Ex. "Q,"** p. 83).

209.    Nurse Moss did not recall ever rendering any medical care to the Plaintiff. (See **Ex. "Q,"** p. 13).

210.    Nurse Moss never heard any scuttlebutt at Stateville regarding employees stealing pain medication such as Tramadol. (See **Ex. "Q,"** p. 64).

**I.    Usha Kartan, M.D.**

211.    Dr. Kartan is a psychiatrist. She has worked at Stateville as a part-time psychiatrist since June, 2010. (See deposition transcript of Usha Kartan, M.D., attached hereto as **Exhibit "R,"** pp. 7 – 8). Her duties include performing intake psychiatric assessments on new patients, performing follow-up assessments, treating psychiatric patients, and taking crisis calls. (See **Ex. "R,"** p. 8).

212.    The process for providing psychiatric patients with medications at Stateville is for the psychiatrist to examine and diagnose the patient, explain to the patient what needs to be done, receive informed consent from the patient, and then a prescription is written. The nurse transcribes the prescription and it is then sent to the pharmacy. The pharmacy distributes the

medication, which is then given to the patient by nurses. (See **Ex. "R,"** p. 12). All of the psychiatric medications are watch-take. (See **Ex. "R,"** p. 16).

213.    In instances where an inmate complains that he is not receiving his medication, it is necessary to perform fact finding to find out what really happened. At times, an inmate will refuse medications, will not want to deal with the nurse, and there will be more to the story than what the inmate says. (See **Ex. "R,"** pp. 33, 35).

214.    The Plaintiff has been Dr. Kartan's patient since October, 2010; she sees him monthly. (See **Ex. "R,"** p. 36). She is his main psychiatric provider. (See **Ex. "R,"** p. 44).

215.    When the Plaintiff previously complained to Dr. Kartan that he was not getting his medications, she checked and followed-up with nursing to find out that the Plaintiff, in fact, refused to take his medicine. (See **Ex. "R,"** p. 41).

216.    The Plaintiff has a lot of negativity, not limited to complaints of not receiving his medication. He is negative of the nursing staff, negative of the medical treatment that he receives from psychiatry, and negative of the medical doctors. (See **Ex. "R,"** pp. 42 – 43).

217.    Dr. Kartan does not recall the Plaintiff having any withdrawal symptoms from not receiving his Remeron or Depakote medications. (See **Ex. "R,"** p. 45). Benadryl is such a benign medication that the Plaintiff would not have had any serve withdrawal side effects if he had missed doses. In fact, the side effects from Benadryl come when taking the medication, and include sedation and grogginess. (See **Ex. "R,"** p. 46).

218.    The Plaintiff is very selective about his medicine and which medications he wants and does not want. He consents to only some medications. He did not agree to many medications. Depressive symptoms and insomnia were an ongoing problem with the Plaintiff because of his lack of consent for complete treatment. (See **Ex. "R,"** pp. 48 – 49). There were

instances where the Plaintiff would not take his prescribed Depakote or would not take a complete dose. (See **Ex. "R,"** p. 49). He also refused antipsychotic medicine. (See **Ex. "R,"** p. 58). There were certain medications that the doctor wanted to prescribe for the Plaintiff, which he refused to take. (See **Ex. "R,"** pp. 58 – 59).

219.    In psychiatric treatment, a patient's participation in, and compliance with, the medication and treatment is essential for the mental health treatment. (See **Ex. "R,"** p. 63).

220.    If a patient reports that he has not received his medication, the problem will be reported to the pharmacy at Stateville. (See **Ex. "R,"** pp. 51 – 52).

221.    If the Plaintiff had been experiencing withdrawal symptoms, Dr. Kartan would have noted that in her chart. (See **Ex. "R,"** pp. 64 – 65).

## VII.    Testimony of Kathleen Martella

222.    Kathleen Martella is the chief administrative officer for Boswell Pharmacy Services. (See deposition transcript of Kathleen Martella attached hereto as **Exhibit "S,"** pp. 7 - 8). She oversees the operations of the company. (See **Ex. "S,"** p. 8). Stateville is one of the prisons that Boswell services in the state of Illinois. (See **Ex. "S,"** p. 12). Boswell's main contact at Stateville is Regina Beattie. (See **Ex. "S,"** p. 13). Ms. Beattie is in charge of sending prescription orders for inmates to Boswell and clarifying any questions on such orders. (See **Ex. "S,"** p. 14).

WHEREFORE, Defendants, WEXFORD HEALTH SOURCES, INC., TIFFANY UTKE, L.P.N., IMHOTEP CARTER, M.D., HEIDI MOSS, R.N., PARTHASARATHI GHOSH, M.D., LATONYA WILLIAMS, P.A., RONALD SCHAEFER, M.D., and ARTHUR FUNK, M.D., respectfully pray that this Court enter an Order granting summary judgment, dismissing the Plaintiff's claims against all Defendants with prejudice, and for such other relief as the Court deems necessary and just.

Respectfully submitted,

CASSIDAY SCHADE LLP

By:  /s/ Ronald E. Neroda
      Attorney for Defendants,
      WEXFORD HEALTH SOURCES, INC.,
      TIFFANY UTKE, L.P.N., IMHOTEP
      CARTER, M.D., HEIDI MOSS, R.N.,
      PARTHASARATHI GHOSH, M.D.,
      LATANYA WILLIAMS, P.A., RONALD
      SCHAEFER, M.D., and ARTHUR FUNK,
      M.D.

Matthew H. Weller #6278685
Ronald E. Neroda #6297286
CASSIDAY SCHADE LLP
20 North Wacker Drive
Suite 1000
Chicago, IL 60606
Telephone:    (312) 641-3100
Facsimile:    (312) 444-1669
Email: mweller@cassiday.com
Email: rneroda@cassiday.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 19, 2015, I electronically filed the foregoing Statement of Facts with the clerk of the court for Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

/s/ Ronald E. Neroda
_____

8022118 RNERODA