36691/01245/MHW/REN

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| DAVID GEVAS, | |
| Plaintiff, | |
| | No. 2012 CV 01297 |
| v. | |
| | Hon. John Z. Lee, District Judge |
| WEXFORD HEALTH SOURCES, INC., et al., | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, WEXFORD HEALTH SOURCES, INC., TIFFANY UTKE, L.P.N., IMHOTEP CARTER, M.D., HEIDI MOSS, R.N., PARTHASARATHI GHOSH, M.D., LATANYA WILLIAMS, P.A., RONALD SCHAEFER, M.D., and ARTHUR FUNK, M.D. (the "Wexford Defendants"), by and through their attorneys, Matthew H. Weller and Ronald E. Neroda of CASSIDAY SCHADE LLP, and for their Memorandum of Law in Support of Motion for Summary Judgment, hereby state as follows:

The MAR forms collectively evidence several dates that the Plaintiff was administered his medications, when he is setting forth claims to the contrary. Moreover, the records show that, overall, the Plaintiff received consistent administration of his prescribed medications. The medical records also show that the Plaintiff was seen and evaluated by medical providers on numerous occasions, and received appropriate prescription renewals

## I.      Introduction

This case involves a claim by Plaintiff, David Gevas, for deliberate indifference against multiple Defendants. The Plaintiff has been an inmate of the Illinois Department of Corrections since      1996      following      two      murder      convictions.      (See

https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx).    He has set forth three claims in this case: first, that he did not receive optical care products, and specifically proper fitting contact lenses; second, that his prescription for Tramadol medication was improperly allowed to expire; and third, that he did not receive his prescribed Tramadol, Remeron, Depakote, and Benadryl, medications, due to the medications being out of stock at Stateville Correctional Center ("Stateville"). (See Plaintiff's Complaint, Doc. #63, and Amended Complaint, Doc. #227).

The Plaintiff's claims are subject to dismissal at this stage for numerous reasons. First, the only Wexford Defendant named in the claim relative to the Plaintiff's contact lenses is Tiffany Utke, R.N., and the Plaintiff has not presented sufficient evidence of Nurse Utke's involvement in the Plaintiff's asserted claim against her; or, that the Plaintiff's constitutional rights were ever violated, in the first instance, with respect to his eye care.

Next, for many of the instances when the Plaintiff claims that he was subject to cruel and unusual punishment for not receiving certain medications, the undisputed medical records make clear that he either received his medication on the particular date(s), or, that he did not have a current prescription for a medication, which was a decision based on a provider's medical judgment and not subject to a claim for deliberate indifference.

Going further, even where the records appear to show that the Plaintiff did not receive a medication when he had a current prescription, the sparse dates of not receiving these particular medications do not amount to a claim for deliberate indifference against these Defendants. The Plaintiff has not made any showing that the conditions for which he was prescribed the medications at issue in this case were considerably worsened by occasionally missing some doses of a particular medication.

Finally, and perhaps most significantly, even accepting the Plaintiff's claims as true at this stage, the Plaintiff has not made the necessary showing of personal involvement, as he must under the law, by any of the individual Wexford Defendants. Moreover, the Plaintiff has not shown that any policy or widespread practice by Wexford Health Sources, Inc. ("Wexford"), caused any violation of the Plaintiff's constitutional rights.

## II.  Applicable Law

### A.  Elements of a deliberate indifference claim against an individual medical provider

The burden is on the Plaintiff to demonstrate deliberate indifference to a serious medical need or condition, and the test of deliberate indifference is a significantly high burden for the Plaintiff to overcome. See *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); see also *Hernandez v. Tex. Dept. of Protective & Regulatory Servs.*, 380 F.3d 872, 882 (5th Cir. 2004). To establish deliberate indifference against an individual defendant, a plaintiff must prove: (1) the existence of a serious medical need or risk; (2) that the defendant was subjectively aware of the serious medical need or risk; and (3) that the defendant demonstrated a culpable mental state by deliberately ignoring the plaintiff's serious medical need or risk. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994); *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). In summation, a plaintiff must establish that a defendant actually knew (independently and subjectively) that the plaintiff required treatment for a serious medical need or risk and nevertheless purposely and deliberately withheld such treatment. See *Sellers*, 41 F.3d at 1102 (emphasis added).

"The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). Deliberate indifference "is merely a synonym for

intentional or criminally reckless conduct." *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991); *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even tortuous recklessness is not enough. *Id*. Unsuccessful medical treatment, neglect, or medical malpractice, are not sufficient to prevail in a claim for deliberate indifference. See *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

Critically, deliberate indifference may only be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." *Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996); see *Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998). A defendant's response to a serious medical need must be so plainly inappropriate as to permit such an inference. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). A medical professional is "entitled to deference in treatment decisions unless no minimally competent medical professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008).

Deliberate indifference constitutes unnecessary and wanton infliction of pain, that which is "repugnant to the conscience of mankind," or which is "so grossly incompetent, inadequate, or excessive as to shock the conscience or be intolerable to fundamental fairness." *Estelle*, 429 U.S. at 106-07. Only then can a plaintiff prevail.

It must also be noted that the constitution does not require that prisoners receive "unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Moreover, mere dissatisfaction or disagreement with a providers' course of treatment is insufficient to prevail in a claim for deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

It is well established that inmates are entitled to only "adequate medical care." *Boyce v. Moore*, 314 F.3d 884, 888 - 889 (7th Cir. 2002); see also *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [the plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Along these same lines, inmates are not permitted to dictate the health care that they receive while incarcerated. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

In a claim for deliberate indifference, the law requires the Plaintiff to place verifying medical evidence in the record to support his claim that the alleged actions or inactions by the Defendants harmed him. See *Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996). *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013), citing *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007). Without any medical evidence of inadequate treatment, a prisoner's self-serving opinion of the quality of treatment is insufficient to raise a genuine issue of material fact. *Walker v. Zunker*, 30 Fed Appx. 625, 628, (7th Cir. 1999). *See also Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

**B.     Required Personal Involvement**

Individual liability under 42 U.S.C. §1983 also requires direct and personal involvement in the situation that causes injury to an inmate. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Section 1983 creates a cause of action based on personal liability that is predicated upon fault. *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005). Thus, "to be liable under Section 1983, the individual defendant must have caused or participated in a constitutional deprivation." *Id.* Moreover, in *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986), the

Seventh Circuit held that Section 1983 liability arises only from direct and individual wrongdoing.

"In essence, this standard requires proof of causation, i.e., that the individual defendant actually caused the Plaintiff's injury through his own conduct." *Volk v. Coler*, 638 F.Supp. 1540, 1547. (C.D. Ill. 1986)(emphasis in original). The burden is on the Plaintiff to establish personal involvement through pleadings and evidence. *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989). Furthermore, the doctrine of respondeat superior does not apply to actions filed under 42 U.S.C. § 1983. *Pacelli v. Devito*, 972 F.2d 871, 877 (7th Cir.1992).

## C.    Elements of a deliberate indifference claim against a corporate entity

In order to recover against a corporate defendant, such as Wexford, under Section 1983, a plaintiff must show that the alleged injury was the result of the corporation's official policy or widespread practice. See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985); *Monell v. New York City Dep't Soc. Servs.*, 436 U.S. 658, 690-91 (1978). An official policy or practice may be established through an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation. See *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011); *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009).

When evaluating whether a plaintiff has produced sufficient evidence to demonstrate that a corporation endorsed a widespread practice, the term "widespread" cannot be overlooked. *Phelan v. Cook County*, 463 F.3d 773, 789-90 (7th Cir. 2006). It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it

occurred more than once. *Id.* Also, broad, vague statements about occurrences affecting other inmates in a detention facility do not support an inference of a "widespread" custom. *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008).

Notably, the Plaintiff must also show a direct causal connection between the claimed wrongful policy or practice and the alleged harm done. In other words, the policy or practice must be the "moving force [behind] the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Specifically, a plaintiff has the burden to show that the alleged policy or practice created a risk of serious harm that was so patently obvious that the corporation must have been aware of it and, by failing to act to rectify it, sanctioned the harmful conduct. *Smith v. Sangamon County Sheriff's Dep't*, 715 F.3d 188, 192 (7th Cir. 2013). This requirement "distinguish[es] acts of the [corporation] from acts of employees of the [corporation], and thereby make[s] clear that [corporate] liability is limited to actions for which the [corporation] is actually responsible." *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007)(quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)) (emphasis in *Estate of Sims*). Consequently, corporate defendants cannot be held responsible for the acts or omissions of their employees under a theory of respondeat superior. *Woodward*, 368 F.3d at 927.

### III. <u>Argument</u>

A. **Refuted Dates of Missed Medications**

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)(holding that the "[r]espondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not

have relied on such visible fiction…"). The records in this case refute any claim by the Plaintiff that he did not receive his prescribed medications on numerous occasions, or that he was in anyway deprived of adequate medical care. (See Defendants' Statement of Facts).

Furthermore, the Medication Administration Records ("MAR"), produced through discovery, make clear that the Plaintiff has overwhelmingly received his prescribed medication on a consistent and uninterrupted basis during the time period at issue in this case. Even where there are sparse dates within the records suggesting that the Plaintiff occasionally may not have received his medications, those few missed doses do not amount to "cruel and unusual punishment," or conduct that is "repugnant to the conscience of mankind." As such, the few dates at issue do not amount to a claim for deliberate indifference under the law in this circuit.

In an apparent attempt to refute the foregoing, the Plaintiff testified that his medical records have been fabricated and that "they…covered…up" dates of him not receiving his medication "as much as humanly possible." (See **Ex. "C,"** p. 190). By his very own admission, however, the Plaintiff cannot point to any specific dates on which his records were fabricated, as he claims. (See **Ex. "C,"** p. 191). The Plaintiff is not permitted to proceed past this stage of the litigation based on such unsubstantiated and speculative claims. *Newell v. Ngu*, 589 Fed. Appx. 782, 787 (7th Cir. 2014). Furthermore, and perhaps more importantly, the Plaintiff has not produced any evidence that the purported fabrication was done at the hand of any of the Wexford Defendants in this case and, as such, cannot show any personal involvement in this regard. Finally, the law does not permit the Plaintiff to go forward with such claims when they are clearly refuted by the records in this case. See supra, *Scott*, 550 U.S. at 380-81.

**B.      Claims Asserted in Complaint**

The Plaintiff filed his original *pro se* pleading in February, 2012. (See <u>Doc. #63</u>). Following appointment of counsel, Plaintiff filed a Verified Amended Complaint on November 25, 2013 (<u>Doc. #227</u>). Other than adding a new party, Director of the IDOC, S.A. Godinez, the Amended Complaint merely incorporates by reference the same allegations as set forth in the original Complaint.

1**.      *Claim One: Contact Lenses***

As against Defendants, Tiffany Utke, L.P.N., and Dr. Norman Patterson, O.D., the Plaintiff claims that they: deliberately "refused to submit the Plaintiff," for a right contact lens that fit properly; ordered the Plaintiff a hard contact lens knowing that he wore soft contact lenses; ordered the wrong reading glasses for the Plaintiff; and, allowed the Plaintiff's 30-day disposable contact lenses to run out. (See <u>Doc. #63</u>, p. 5, paras 27 – 29; p. 6, para. 36; p. 7, para. 39). Dr. Patterson was the optometrist at Stateville during the relevant time period. He previously settled the Plaintiff's claim against him and, subsequently, provided a deposition in this case.

The Plaintiff's claim against Nurse Utke fails for two reasons. First, the underlying gist of the claim is defeated by the undisputed, independent, testimony of Dr. Patterson. Dr. Patterson's testimony makes clear that there was no deliberate indifference, whatsoever, with respect to the Plaintiff's care vis-a-vis the eye clinic at Stateville.

Dr. Patterson testified that he saw the Plaintiff many times in the eye clinic and many more times than other patients. (See **Ex. "D,"** pp. 17 - 18). Contrary to the Plaintiff's complaints, however, Dr. Patterson confirmed that the Plaintiff was able to see without issue. (See **Ex. "D,"** pp. 17 – 18). Furthermore, there was no reason why the Plaintiff needed to wear contact lenses

rather than glasses. (See **Ex. "D,"** pp. 38, 42). Even still, there was no instance where the Plaintiff ultimately did not receive his contact lenses. (See **Ex. "D,"** pp. 49 – 50).

There is a process for approval, ordering, and making of contact lenses for inmates, which takes time to complete. (See **Ex. "D,"** pp. 49 – 50). During any period of time that the Plaintiff was waiting for his new contact lenses to arrive, he still had his eye glasses to wear. (See **Ex. "D,"** pp. 49 – 50). Thus, it cannot be said that the Plaintiff was deliberately ignored in anyway with respect to his eye care.

The crux of the Plaintiff's claim is that he did not receive proper fitting contact lenses on a timely basis. In this case, it is undisputed that the eye clinic staff took all reasonable measures to provide the Plaintiff with multiple replacement contact lenses (which were not afforded any other inmate at Stateville), and that the Plaintiff's eye glasses were perfectly suitable for his vision at all times. (See **Ex. "D,"** p. 19). It should also be highlighted that the Plaintiff is not claiming that any harm was actually done to his eye or his actual vision, and Dr. Patterson's testimony makes clear that, after he saw the Plaintiff numerous times in the eye clinic, it was known that the Plaintiff could see properly with his eye glasses. (See <u>Doc. #63</u>, pp. 5 – 8; and **Ex. "D,"** p. 19).

There is not a viable claim with respect to the Plaintiff's eye care, against any party. See *Zuege v. Knoch*, 423 Fed. Appx. 621, 623 (7th Cir. 2011)("Even gross negligence is insufficient to establish a constitutional violation if the defendants are not subjectively aware of a risk of harm from their inadequate treatment."). Here, as in the *Zuege* case, the undisputed record shows that Dr. Patterson repeatedly examined the Plaintiff, and reasonably responded to all of the Plaintiff's complaints. *<u>Zuege</u>*, 423 Fed. Appx. at 623. (See **Ex. "D,"** pp. 17 – 18, 27) .Under

these facts, the Plaintiff has not made out any case for deliberate indifference with respect to his first claim in this case.

The Plaintiff's claim against Nurse Utke also fails because the contradicted record makes clear that Nurse Utke did not have the necessary personal involvement, or culpable state of mind, such that she could be liable for the Plaintiff's claim against her. Indeed, the Plaintiff himself testified that Nurse Utke was not always present when he had appointments with Dr. Patterson, and that when Nurse Utke was present, his interactions with her would be limited to her handing him his contacts and having him sign a form of receipt. (See **Ex. "C,"** pp. 210 - 211).

Nurse Utke was one of the nurses stationed to work in the eye clinic at Stateville. Her duties in the eye clinic included scheduling inmates for appointments and giving them their eye glasses upon delivery to the eye clinic. Other than giving the Plaintiff's contacts and contact solution to him, Nurse Utke did not provide any other services to the Plaintiff in the eye clinic. (See **Ex. "P,"** pp. 44 - 46). She also did not personally receive any notes or internal mail from the Plaintiff. (See **Ex. "P,"** p. 89). What she did do was, when she received a request from the Plaintiff, add the Plaintiff to the optometrist's schedule for an appointment, or speak with the optometrist directly to determine when the Plaintiff could be seen. (See **Ex. "P,"** pp. 39 – 40). When Nurse Utke received a request or complaint from the Plaintiff that his contacts or glasses were not working, she followed the procedure of putting the Plaintiff on the schedule to see the optometrist. It is undisputed that the Plaintiff was seen frequently in the eye clinic. (See **Ex. "P,"** pp. 41 – 42).

Notwithstanding the foregoing, the Plaintiff claims that Nurse Utke "refused to submit," him for a proper fitting right contact lens. Nothing in the record of this case remotely suggests that Nurse Utke had any role in ensuring that the Plaintiff's contact lenses fit properly. In fact,

11

the testimony of Dr. Patterson establishes that the Plaintiff was literally the only inmate at Stateville with contact lenses and the State had not equipped the eye clinic with equipment to fit contact lenses. (See **Ex. "D,"** pp. 18, 26, 29).

The Plaintiff also claims that Nurse Utke deliberately ordered him hard contact lenses knowing that he wore soft contact lenses. First, even accepting this claim as true, it does not rise to the level of deliberate indifference under the law. Beyond that, the undisputed evidence is that Dr. Patterson saw and examined patients in the eye clinic. (See **Ex. "D,"** pp. 11, 16 - 17). His orders would then go through to Wexford for approval and further processing. (See **Ex. "D,"** p. 49 – 50). It is undisputed that the examination and ordering of optical care products for the Plaintiff's eye care was done by Dr. Patterson, and Nurse Utke was not involved in that process. (See **Ex. "P,"** pp. 44 – 46; **Ex. "D,"** p. 17).

There is no evidence that Nurse Utke acted with any culpable state of mind because she played no part in Dr. Patterson's treatment decisions and, moreover, nothing in the record suggests that she had any authority to act, as the Plaintiff claims she should have, with respect to the Plaintiff's eye care. *Williams v. Guzman*, 346 Fed. Appx. 102, 106 (7th Cir. 2009).

2.    ***Claim Two: Expired Prescription Orders - Tramadol***

The Plaintiff claims that on the dates when he did not receive his Tramadol, the Defendants allowed the medication to expire without re-evaluating the Plaintiff and/or re-prescribing the Tramadol "before the prescribed Tramadol expired." (See Doc. #63, pp. 8 – 9, para. 53). Even accepting as true that the Plaintiff did not receive continuous Tramadol prescription renewals as alleged, he has still failed to raise a genuine question of material fact as to deliberate indifference on the part of any Wexford Defendant.

To begin, it is undisputed that there was a mechanism and procedure in place for inmates at Stateville to request refills for current prescriptions and to request a medical appointment ("sick call," in the Stateville parlance) in order to obtain a prescription renewal. Moreover, it is undisputed that the Plaintiff was aware of this procedure. (See **Ex. "K,"** p. 84, 102; **Ex. "C,"** pp. 32 – 33). Indeed, the evidence is clear that it was incumbent upon the Plaintiff (or any inmate for that matter), after one of his prescription orders had expired, to request an appointment with the medical staff if he desired to have his prescription renewed. (See **Ex. "K,"** p. 102). This, of course, is the same practice that any patient, incarcerated or otherwise, would similarly follow with his or her healthcare provider. (See **Ex. "K,"** p. 104, 105). Here, the Plaintiff is attempting to shift his portion of the responsibility for his own healthcare to the Defendants. As with any person under a treater's care, it is incumbent upon the patient to follow-through with his own care and treatment. The undisputed evidence shows that the Plaintiff knew that he had available to him a means by which he could request medical appointments, and that if he desired a medication renewal, he needed to make such a request.

Put another way, to succeed in his claim that he suffered a constitutional violation because his Tramadol prescription was "allowed" to expire, the Plaintiff would have to present evidence that he requested a prescription renewal, or to be seen for an evaluation, that he was medically indicated for the same, and that he was harmed when his request was disregarded by one of the Defendants. *Williams v. Guzman*, 346 Fed. Appx. 102, 105-106 (7th Cir. Ill. 2009). There is no evidence of any of this in the record of this case. Indeed, the record is replete with instances where the Plaintiff was permitted access to medical providers, evaluated, and given prescription renewals. Furthermore, simply because he was provided with subsequent Tramadol

prescription renewals, the record in this case does not support that permitting the prior prescriptions to expire without an immediate renewal was deliberate indifference.

There is no evidence, whatsoever, that any Defendant ever denied or refused to see the Plaintiff when requested to do so. More pointedly, the Plaintiff has not placed any evidence into the record of this case to show that any individual Defendant acted in deliberate and conscious disregard to the Plaintiff being harmed by not having a continuous prescription for Tramadol. *Williams v. Guzman*, 346 Fed. Appx. 102, 106 (7th Cir. 2009).

"Deliberate indifference to a known risk is a form of intent…to show scienter by the deliberate-indifference route, a plaintiff must demonstrate that the public official knew of risks with sufficient specificity to allow an inference that inaction is designed to produce or allow harm." *Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2012). There is no such evidence in the record of this case that the intermittent expirations of the Plaintiff's Tramadol prescription constituted deliberate indifference.

The medicine behind this case also refutes the Plaintiff's claim. The law is clear that the Plaintiff is not permitted to dictate his own medical care. Tramadol is treated as a controlled substance. (See **Ex. "J,"** p. 36). It is undisputed, here, that Tramadol is a potent, narcotic-like drug, which is not medically recommended to be taken on a continuous, or uninterrupted, basis. (See **Ex. "J,"** pp. 28, 34 – 36).

The record in this case reflects exactly the opposite of the well established legal definition of deliberate indifference and the testimony of the Plaintiff's treaters' sheds further light on this matter: to wit, the Plaintiff's Tramadol prescription was never intended by any of his providers to be continuous or non-stop. The medical testimony makes clear that there was no deliberate indifference in allowing time in between the Plaintiff's active prescriptions for

Tramadol, in order for him to be revaluated prior to receiving a further order for this opiate-like medication. The undisputed facts show that each of the Plaintiff's medical providers agreed that the medication should not be given indefinitely and it was appropriate to have breaks in administration of the medication for re-evaluation. (See **Ex. "K,"** p. 73, 155). The Plaintiff has provided no verifying medical evidence contrary to this position. Going further, if the Plaintiff desired a more prompt appointment for renewal, he had a mechanism through which to request the appointment, and he also had access to other forms of pain management, including Ibuprofen.

The Plaintiff has created no genuine question of material fact that any of the Wexford Defendants allowed the Plaintiff's prescriptions to expire out of conscious disregard for the Plaintiff's medical care or his wellbeing. In fact, the only evidence in the record of this case is that it was medically appropriate (and, in fact recommended) that the Plaintiff not take Tramadol in a continuous and non-stop fashion. (See **Ex. "K,"** p. 73, 155). As such, there is no genuine question of material fact as to any constitutional violation with respect to the Plaintiff's claims that his Tramadol prescription was wrongly permitted to expire prior to renewal.

3. ***Claim Three: Medication Not in Stock - Tramadol, Depakote, Remeron, and Benadryl***

In his third claim, the Plaintiff asserts that there were "numerous occasions" when his Tramadol, Remeron, Depakote, and Benadryl medications ran out of stock. (See <u>Doc. #63</u>, p. 12, paras. 76 - 77; p. 13, para. 85). At this stage, the Plaintiff has provided only a few specific dates when certain of his medications were not delivered to him. Even assuming, *arguendo*, that the Plaintiff has accurately set forth the dates (or "numerous occasions") when his medications had run out at Stateville, his claim still fails. The undisputed record in this case makes clear that none

of the individual Wexford Defendants had the requisite personal involvement relative to Plaintiff's claim that medications were permitted to run out of stock.

The chain of actions through which medications at Stateville are prescribed by providers, and subsequently distributed to inmates, is set forth in Defendants' Statement of Facts. It is the function of the Stateville registered nurses who pass watch-take medications (which all of the medications at issue in this case are) to turn in a refill sticker to the IDOC pharmacy technician, Ms. Beattie, when a prescription was due for a refill. Ms. Beattie was to fax the refill sheets to Boswell. (See **Ex. "F,"** p. 26). The Plaintiff has presented no evidence that any of the individual Wexford Defendants were involved in that process. It was the responsibility of the IDOC personnel to submit the prescription orders to Boswell, the offsite pharmacy. (See **Ex. "E,"** p. 24; **Ex. "F,"** p 10). It was Boswell's independent contractual obligation to timely fill and deliver the prescription orders. It was then the responsibility of the IDOC personnel to receive the medications, confirm that the prescription orders were properly filled, and ensure that the Stateville nurses and medical technicians received the medications for distribution to inmates in the cell houses. (See **Ex. "F,"** p 11, 12, 13 – 14, 15, 16 15, 41 – 42). Notably, it is undisputed that the pharmacy functions onsite at Stateville were operated by IDOC personnel. (See **Ex. "F,"** p. 12; **Ex. "H,"** p. 29).

Nothing in the undisputed record supports a claim for deliberate indifference against any of the Wexford Defendants. There is no evidence, for example, that any of the Wexford Defendant physicians, or the physicians' assistant, Ms. Williams, deliberately failed to order a prescription for the Plaintiff when medically indicated. Moreover, as the uncontradicted record shows, once a provider completes a prescription order, the responsibility for delivery of

medication to Stateville and distribution of medication to inmates rested with the IDOC and Boswell.

There is no evidence that any other Wexford Defendant had any involvement in the medication ordering or distribution process for the Plaintiff, such that the Plaintiff may proceed with his claim against them. (See **Ex. "F,"** pp. 50, 51, 53). It is undisputed that the Wexford Defendants did not have any personal involvement in the steps in the process for ordering and delivering medications that could have caused the medications to run out.

The record makes clear that, other than the IDOC personnel charged with the ordering and distribution of medication, the only other position at Stateville which could have had any connection to the Plaintiff's claim that his medications ran out, would be members of the nursing staff through their actions in forwarding a medication refill sticker to the IDOC pharmacy technician. The only registered nurse who the Plaintiff has named among the Wexford Defendants, with respect to this claim, is Heidi Moss, R.N., and it is undisputed from Nurse Moss's testimony, that she did not have any involvement in distributing medications to the Plaintiff or receiving renewal stickers from him. (See **Ex. "L,"** pp. 213 – 214; **Ex. "Q,"** pp. 10, 40, 29).

In short, the Plaintiff has not made any showing that any of these Defendants caused the Plaintiff's medications to run out or purposely and intentionally disregarded a known instance, or even risk, of the Plaintiff's medication being out of stock. Moreover, even if the Plaintiff could make such a showing, the sporadic instances in which the MARs indicate that the Plaintiff did not receive certain medications do not evidence a systemic deprivation or pattern of conduct by any Wexford Defendant, which would amount to a constitutional claim for cruel and unusual punishment.

## IV.    No Unconstitutional Policy or Practice by Wexford Health Sources, Inc.

The two claims that the Plaintiff asserts against Wexford are that it allowed his Tramadol prescription to expire without an immediate renewal and that it allowed the stock of his prescribed medications to run out at Stateville. (See Doc. #63, pp. 8 - 14). The Plaintiff's claim against Wexford fails because he has not raised any genuine question of material fact that a policy or practice in place by Wexford caused any of the claimed constitutional deprivations in alleged by Plaintiff.

It is well established that, in order to go forward with a claim against Wexford, the Plaintiff must show that a policy or practice by Wexford was the "moving force [behind]" his claimed constitutional violation. *City of Canton*, 489 U.S. at 389. Because the Plaintiff has made no such showing at this stage, his claim against Wexford must be dismissed with prejudice.

At the outset, and as set forth herein, the Plaintiff has not made out any claim of deliberate indifference regarding the expiration of his Tramadol prescription. Furthermore, even if the periodic (and medically recommended) expiration of his Tramadol medication amount to a constitutional violation, there is no evidence, whatsoever, that allowing the medication to expire was a direct result of a policy or practice in place by Wexford. There is also no evidence that any policy or practice in place by Wexford caused a widespread and pervasive problem of Tramadol prescriptions not being renewed for inmates, if medically indicated. Phelan, 463 F.3d at 789-90.

By the same token, the Plaintiff has made no showing that on the few occasions that his prescribed medication had run out of stock at Stateville, the issue arose as a direct result of a policy or widespread practice, by Wexford, at Stateville. It is, as already discussed herein, undisputed that the process for ordering, delivery, and distribution of medications at Stateville was operated and controlled by the IDOC and co-Defendant, Boswell.

18

There is no evidence in the record of this case that Wexford had any policy or practice in place that could have contributed to any instance where the Plaintiff's medication had run out. But, even if there was, that would not even be enough. The Plaintiff has presented no evidence that any policy or practice in place by Wexford caused a widespread and pervasive problem of medications running out of stock at Stateville. *Phelan*, 463 F.3d at 789-90. Accordingly, the Plaintiff's claim against Wexford in this case must be dismissed with prejudice.

## V. <u>Conclusion</u>

For all of the foregoing reasons, the Plaintiff has failed to raise a genuine question of material fact as to any of his claims against the Wexford Defendants such that he should be provided the opportunity to present his case to a jury. All of the evidence in the record of this case shows that no reasonable jury could find that the Plaintiff suffered any constitutional violation by any of these Defendants. Therefore, the Plaintiff's claim should be dismissed, with prejudice, in its entirety.

WHEREFORE, Defendants, WEXFORD HEALTH SOURCES, INC., TIFFANY UTKE, L.P.N., IMHOTEP CARTER, M.D., HEIDI MOSS, R.N., PARTHASARATHI GHOSH, M.D., LATANYA WILLIAMS, P.A., RONALD SCHAEFER, M.D., and ARTHUR FUNK, M.D., respectfully pray that this Court enter an Order granting summary judgment, dismissing the Plaintiff's claims against all Defendants with prejudice, and for such other relief as the Court deems necessary and just.

Respectfully submitted,

CASSIDAY SCHADE LLP

By: /s/ Ronald E. Neroda
     Attorney for Defendants,
     WEXFORD HEALTH SOURCES, INC.,
     TIFFANY UTKE, L.P.N., IMHOTEP
     CARTER, M.D., HEIDI MOSS, R.N.,
     PARTHASARATHI GHOSH, M.D.,
     LATANYA WILLIAMS, P.A., RONALD
     SCHAEFER, M.D., and ARTHUR FUNK,
     M.D.

Matthew H. Weller #6278685
Ronald E. Neroda #6297286
CASSIDAY SCHADE LLP
20 North Wacker Drive
Suite 1000
Chicago, IL 60606
Telephone:    (312) 641-3100
Facsimile:    (312) 444-1669
Email: mweller@cassiday.com
Email: rneroda@cassiday.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 19, 2015, I electronically filed the foregoing Memorandum of Law with the clerk of the court for Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

/s/ Ronald E. Neroda

8016322 RNERODA